Our next case for argument is 24-1140, Versata Software v. Ford Motor Company. Mr. Lampkin, please proceed. Thank you, Your Honor. May it please the Court. I'd like to begin with the breach of contract damages issue, a pure issue of evidentiary sufficiency, not subject to the Trade Secrets Cross-Appeal. Can I actually ask you about the investor enrichment stuff? I know that's not where you want to begin, but it's where I want to begin. Hypothetically, and here's where I'm struggling with you on this unjust enrichment stuff. Hypothetically, let's assume I agree with you that the District Court erred as a matter of law in excluding unjust enrichment as a possible theory. But also hypothetically, I agree with the District Court's exclusion of your expert witness under Daubert on that issue because his testimony was speculative and whatever he said. So you win on one, you lose on one. Where does that leave us? So I think it leaves you with a remand. And that's because when the District Court found similar errors with respect to another reasonable royalty theory, the District Court gave us a chance to fix it. And we should have that same opportunity to fix those alternative bases the District Court gave here. So if you look at 26,975, we should have that chance. The District Court should be allowed the opportunity to consider whether to give you that chance. We shouldn't order him to give you that chance. So I know you want us to, but I mean, that would be the first thing. We would at least like the District Court to consider that opportunity. Yes, I think that's right. And the reason we didn't... Okay, I understand. Because I was a little concerned that I was struggling with whether honestly the error was, if there is error, whether it was harmless or not. And you're, I mean, I'm sure we're going to hear that from the other side, but your argument is at the very least, the District Court might give you an opportunity to supplement that expert report. I think that's exactly right, Judge. Correct. Getting back to the contract question, is it right that none of the issues presented with respect to the trade secret, the exclusion of a particular remedy, the deficiencies of expert testimony, et cetera, none of those have spillover effect to the contract? That's correct. I mean, there is an issue that would be for remand, which is whether it's an election of remedies issue that the District Court didn't address and wouldn't address in remand. Right, I thought you had... But aside from that, no, this is just purely a question of evidentiary sufficiency. And on that, there's ample evidence from which the jury could find. One more tiny preliminary question. Is it settled or clear, settled in this case or otherwise clear that trade secret misappropriation, unjust enrichment remedy would be for the jury rather than the judge? So unjust enrichment would be for the jury. This has come up before. Yes, it has. But in this case, because we have two statutes, and both of the statutes describe them as unjust enrichment damages or a measure of damages consisting of unjust enrichment, this is something that would go to the jury. And is that an agreed on proposition or just that's your position? And it's certainly our position. And the statute... There hasn't been a ruling on that here? Pardon? There hasn't been a ruling on that here? There hasn't been a ruling on that, whether or not it would be presented to the jury or not. And the District Court understood that this would go to the jury because he said, look, I just don't have discretion to let that go to the jury. And I'm going to exclude it as opposed to saying, I've decided it, my discretion has decided it. OK, you can get back to the... Thank you. Look, the District Court found only one basis for saying that overturning the $82 million damages verdict and slashing it to $3 in nominal damages. And that was although there was ample evidence of the revenues that we obtained, that we lost as a result of the breach, there was insufficient evidence supposedly about what costs we avoided by not having to perform. But there were at least two different bases that the District Court really didn't tarry with. One is that there are two contracts. One contract at $14.95 million that included support and would have support costs, but another one for $10.95 million that didn't include support. And that $4 million delta, the jury could have understood, would have been the price. And that's at least cover the costs of any support. Can you just remind me of the procedural history? I guess something in particular, was your expert on this issue excluded? So there was an expert... Explain what happened. Yeah, there was a supplemental report from an expert at McBain who presented sort of a cost basis, trying to figure out if we're going to try and claim fees for the support, what the delta was, what the cost was, and what the price was, so you could come up with the difference. But that expert was excluded. And so we were left to basically say, okay, we're not going to claim the fees. I'm sorry. And specifically, I mean, what was excluded was proposed testimony on this very measuring the contract damages issue or something different. It was actually a very different proposition. That expert was looking at how much did it provide support. What we presented at jury was we were not going to claim damages in connection with the price of support. We're just going to say, we'll go with just the naked license that doesn't provide support, $10.5 million for the naked license, the naked ability to use our software with no extra amount for support. And you could tell the $4 million was the difference because there was one at $14.95 million and one for 10.9 million. And Ford's own witness says the 10.95 takes out that $4 million of other types of fees and services and support and maintenance and so forth. So there's evidence which the jury could get from $14.95 million to $10.95 million, which was very close to what the jury actually came out with. Why isn't this what you just described the kind of issue of which there are some, but not all issues fall into this category where a jury needs guidance from an expert and not just from a lawyer? Well, because this is a very simple exercise, which is what was the price and were there costs? If the price is 10.95 million without support and $14.95 million with support, well, the $10.95 million and the $4 million delta tells you how much profit we would have had or the maximum amount of profit we could have gotten from providing support. How do we know that there weren't any costs associated with the $10.95 million figure? So no one has ever identified anything that would be a cost associated with that other than the idea of support. The district court pointed to error correction, but actually the district court made a mistake on that. I think that's what I'd like to turn is because if you look at the contracts themselves, if you look at page 71,630, which is on volume four, and mind you, this is an already implemented set of software. It's sitting on Ford's servers. They've been using it for a decade. So what's left is... I think we could run our software without an IT department. But of course, Ford has its own IT department. It doesn't necessarily need us. And there's actually... And they had access. They were under the cone of silence about whatever was secret in the software. They should have been under the cone of silence, but they did not do that. But if you look at exhibit 71,630, this is the original contract from 2003, I believe. And if you look at the bottom, it has a heading four, support, and it says error corrections, support obligations 4.2. So this is all the support that's provided under the 2003 version. But if you flip 13 pages later... This is the support under the 14.95 million. Well, this is the very original contract. But if you go to this, and then we're going to get to the 10.95, on 71,643, and it says 11, halfway down, it says extended support and enhancement services for unsupported software. And the first sentence says, Versada shall no longer provide generally available support enhancements. So it says, we're no longer providing support. This contract, this addendum as of 2011, no support. Instead, look at the next page, support is separately priced out. Extended support and enhancement services term and payment schedule. The next page provides all the payment for support. So the jury had before it $10.95 million for a contract with no support, and then all these payments, $916,000, $500,000, et cetera, for the support separately. So the jury could easily determine how much was the contract with no support, nothing provided for the software already on the system, $10.95 million. How much was the support separate, which we're not going to let us recover because we can't back out costs. That's the additional here, or the $4 million out of the $14.95 million. Was there testimony about all this? Yeah. Or did you expect the jury to just dig through the documents and make this determination? Well, since it's sufficiency of the evidence, the jury isn't allowed to do this. But we did have argument, and the lawyer said, look, here's the numbers, and here's what Ford's witness said. Ford's witness said, hey, if you start at $14.95, $4 million takes out all the fees for support services. And that's exactly what the restatement... So you're saying, wait, just let me make sure I understand. So you're saying, look, there wasn't an expert, but the documents were provided to the jury, and the lawyer walked the through what they should glean from the documents. Is that the idea? That's correct. But there were experts on what the value of support was. The expert, Ford's own expert said... There was no expert that testified as you just walked us through in a much clearer fashion, perhaps had you been at the trial, we wouldn't be here. But you weren't. And so there was no expert that did what you just did with us. Yes. But this is in response to what the district court said. The district court, instead of looking at the sufficiency of the evidence and saying, gee, a jury could do this subtraction, the jury could do this. He said, oh, it's absolutely clear that there was some support and he went to the 2003 version. But I want to make sure my question was answered. Did a lawyer, even if an expert did, because you're agreeing an expert didn't do what you just did, correct? So in terms of the contract? Yes. No. Did a lawyer do that? Did somebody walk the jury through these documents? You gave us four volumes. I can't fathom how many volumes the jury got throughout the course of the trial. Did all of this stuff just come in a giant pile to the jury and say, have fun with it? Or did somebody walk through the documents in the wonderfully precise way you just did so that we could feel confident that the jury understood this to be one of the arguments it was deciding? Yes. We can be confident the jury understood that we talked about two contracts, one for $14.95 million, which included support, and one for $10.95 million that didn't include support and thus wouldn't have costs. And in closing, we made exactly that argument to the jury. And their own expert said the $10.95 takes out $4 million in other types of fees. Their expert again says software license fees are different from additional fees charged for things like consulting services or support. These are things that the jury, under the Supreme Court, said Coleman. Even though your expert was included, their expert provided testimony that distinguished between the licenses and the costs. Yeah. And the only testimony that was excluded from our expert was an effort to try and go through and say, here's how many hours you put in. Here were your costs, et cetera. Are there any non-support costs? So you've now distinguished between support and the two contracts. Are there any non-support costs? No one has ever identified any cost other than things like error correction support that were not included in that contract. If I can turn very briefly then to the trade secrets question. I wanted to focus on non-unjust enrichment, although that is a concern for us. But the second and third scenarios of reasonable royalties that the district court excluded. Well, if we think there's something wrong with unjust enrichment, they were predicated on that. So they have to come back in. So is that what you want to focus on? Because if so, we're done. What else? Well, if the court believes that there was the same mistake, yes. But it's a double error. Because the district court said you just plain can't count Ford's benefit. But one of the core things in parties that are negotiating a license. But we don't have to reach this issue if we, unless I'm mistaken, if we agree with you there's a problem with unjust enrichment. It's clear that unjust enrichment pervaded the two of the three. Yes. If you agree with us, I think it falls a fortiori. It becomes doubly error. In that case, I'd like to reserve any of the remaining time for rebuttal. Thank you. Miss Ellsworth. Good morning, your honors. And may it please the court, Jessica Ellsworth for Ford Motor Company. I'd like to spend 12 minutes on our appeal and cross-appeal and reserve three minutes for rebuttal. On Versada's appeal. First, the district court acted within its discretion to exclude Versada's unjust enrichment damages model, which the court found fell short under Daubert and Rule 702 on both relevance grounds and separately for reliability reasons. But if we read the district court's opinion as doing both that and saying as a matter of law unjust enrichment is inappropriate when there is licensing, if we read it that way, I know you don't want us to read it that way, but if you read it that way, that's wrong as a matter of law, isn't it? That you can't have an unjust enrichment theory in a licensing scenario? So, your honor, I want to make sure to answer your question. I think the district court said this unjust enrichment model. No, no, no. I understand what you want to argue. My question is, and you can treat it as hypothetical if you want. I'm not making you concede anything. If the district court found that as a matter of law, you cannot have an unjust enrichment theory if there's a history of licensing between the parties and that you can only use a reasonable royalty theory, that's wrong as a matter of law, right? If you find that that is wrong as a matter of law. No, I'm asking you, is that wrong as a matter of law if that's what he decided? I understand you think that's not what he decided, but if that is what he decided, is it wrong? So, I think if it were a blanket statement that you could never have an unjust enrichment model. That's what I'm asking you. When there's licensing. I think there is no case law that goes either way on that question. And the issue here is that we are in a Dalbert and Rule 702 context. Okay, but there is a case law. There's a lot of case law cited in his brief that suggests that you can have unjust enrichment in a licensing context. So, maybe there's not a blanket statement to the fact that as a matter of law, you can do it. But clearly, courts have said you can have an unjust enrichment theory even if there's licensing. You agree with that, right? So, Your Honor, I think the Russo case- Can you answer my question? Well, I don't think there is a case that has a history of licensing in which a court has awarded unjust enrichment. Are you trying to argue that the district court, if that's what the district court said, what I think he said is right? That you can never have unjust enrichment if there's licensing? Your Honor- Your position? I know you don't- I don't think you need to go as far as do that. But if you think- You're here before us to help. This is an important legal question. And if we rule in his favor, we're going to have to address that. You need to take a position on this, I think. I mean, if you don't want to, you don't have to. But you're here to aid us in deciding how we're going to address this important trade secrets damages issue. And I still am struggling with whether you think that as a matter of law, you can or cannot have unjust enrichment damages if there's a history of licensing. Your Honor, the reason I'm struggling with the answer to your question, and I don't want to pressure you- I think we have to answer that question. So if you don't- I don't think you do. Yeah, well, I think we do. Okay. So if I think we do, we may not ultimately. But if I think we do, do you have an answer to help us? Or are you just going to abdicate? So I do not think that the- I do not think that a plaintiff who says, I want to seek unjust enrichment damages, automatically gets to do so. There is a gatekeeping- Aren't they automatically excluded from doing so? They're not automatically excluded, no. They are not automatically excluded. That's where Daubert and Rule 702 come into play. And the Russo case that Versado wants you to focus on does point out that the statute authorizes different sorts of damages. But nothing in Russo, or any other case, says that the statutes override a district court's gatekeeping function to look at the facts and circumstances in a particular case and determine if an expert's model is a good fit. And that is what the district court did here. Well, so a perhaps more mod- I don't think this changes the analysis. So there was Daubert-type reliability assessments. But there was also the piece where the district court either said, because you've repeatedly licensed, you can't seek to get as damages what would otherwise be disgorgement of gain from the defendant. And then there's a slightly more modest version, which is that that would not be unjust enrichment. So that sounds like a legal proposition. I think you are exactly right, that the court said in the facts and circumstances of this case, applying my Daubert gatekeeping function to look at whether this use of an unjust enrichment model fits the case, it doesn't. Because we have 10 plus years of licensing this software. And Versada built its whole case around the idea that Ford should have continued to license the software until it had achieved independently its own version of it. So this whole case was built around the fact Ford could have done this, it just would have taken them longer. And that's because what they charged, two things, this is on the royalty side, what they charged in the license was for a serious cone of silence, let's call it that, and not use it to develop your, which would not be independent. But also that just as a matter of law, the statutory federal and state, that the statute says one of the options for the plaintiff is to get whatever the gain was that the defendant had, even if we were willing to live with a, over the years, a lower payment, because it's really bad conduct. That's the idea of this. That's why you build in this unjust enrichment. So even with the unjust label that the district court used, I'm not sure that changes the fundamental proposition. So again, this is all about the relevance concern that the district court had with this theory. But it was that there was nothing unjust about paying the license fee to continue using the software. And so that is why the district court said, this is a case where unjust enrichment and actually reasonable royalty, those two paths really come together. Because the way this history of this relationship worked is that the value of using that software, including during the period of time that Ford would have needed to independently develop it, was the license fee. So can I get you now to shift back to the, what you've been trying to talk about is the reliability concerns. I think Mr. Lampkin makes the point that he should have the opportunity to have his expert correct identified deficiencies. And one reason that's non-speculative is that something like that second chance was given for kind of related deficiencies. Can you address that? I am happy to address that, Your Honor. So I would start with the fact that the court spent seven pages talking about the reliability problems when it first excluded it. Those are at APX 30 to 37. And there were at least three different separate reliability problems that the district court identified. And then Versada did seek reconsideration. It came back and said, let us have a do-over. Here's our attempt at a do-over. And if you look at page APPX 84, which is in the district court's opinion on reconsideration, the court goes on to say there that it excluded the testimony for reasons beyond Ellison's use of unjust enrichment. And it walks through these multiple independent grounds that supported the decision to exclude their testimony. If Versada had had a way to correct those problems, the time to do it was when it was already seeking reconsideration of the court's ruling. It's not now, many years later, when they have gone through trial, they have lost on Jamal. Is Mr. Lenokin right that a similar correction opportunity was provided with respect to related deficiencies I guess on the royalty side? So the answer is no. A similar correction was not made. And you can see this because the $134 million per year number that Versada wanted to use, the court found was based on projections. It was not clear that it was ever used. In the court's assessment of this information, which was in front of it, and again, this is all within district court's discretion. Okay, which, the $134, that's- That's the unjust enrichment value. Right, and then what were the- It could not correct the problems with that unreliability problem because it didn't have a way to make that number be a reliable projection of cost savings starting in 2015. That is what the court said. So there were some apportionment problems, the failure to apportion that $134 million- And why was a different deficiency for which correction, the district court did allow correction, different from that? So even today, Your Honor, I don't understand Versada to have any argument for what it could have done to correct the use of this $134 million number that had no actual basis in any actual computation of cost savings that was attributable to the trade secrets. There's nothing they could do about that. And that is one of the reliability problems that the court identified. That alone is a reason that this damages model was excluded, was properly excluded, and any of the other arguments really do amount to harmless error, Judge Hughes, because there is no way around that reliability problem at all. And it was certainly within the district court's discretion when looking at those documents, many of which- What about the error with regard to the two reasonable royalty theories that were excluded? If we conclude that there's error? So there were problems with those other two reasonable royalties. I think there are at least three problems. One is that- Are these problems that the district court found expressly? Yes, Your Honor. Let me be clear. Yes. And tell me what page so I can reference it. I do not have the page number, but if I may use part of my rebuttal time, I will give you the page number. The district court found that there was no trade secret by trade secret allocation of the- in scenario two and three of this reasonable royalty model. Versada was trying to do two things. It was trying to claim 8.3 years, the duration to build software independently. And then it was trying to say, but Ford, you saved development costs because you built it in three and a half years. So we want to get that long period of time and we want to get all the development costs that it took to build PDO. Well, there was a mismatch there between the time periods. They couldn't get 8.3 years if what they were really talking about was the saved development costs. But the development costs did not relate to the trade secrets. The development costs were for the entirety of the PDO software. You're now in your rebuttal time and that's fine. It's your time to use, but you didn't really meaningfully address his arguments on the contract damages. Do you want to at least spend a minute doing that? Because I feel like that was where all his time was spent. Yes, Your Honor. I would be very happy to spend a minute of time on that. I think that the contract damages, the district court was exactly right when it found that there was no expert who testified about contract damages. There was no witness who talked about contract damages. There was no document that calculated contract damages. There is one passing line in the closing statement where Versada's lawyer said, as an alternative, maybe you could use this $10.5 million number, but you shouldn't do it. That's it. That is the only reference to that in connection with the contract damages. I would note that... You heard me ask Mr. Lampkin a lot of questions about, well, maybe if you had been at the trial court and walked the jury through what you just walked us through, is that sort of where you stake your flag? That's exactly right, Your Honor. They absolutely did not present this issue to the jury this way. Is that what you're... They absolutely did not present the issue to the jury this way, and Judge Moore, they didn't present it this way for a reason, which is that the court excluded them from seeking lost profit damages in advance of trial. They then moved to clarify that they could try to get that testimony in through a fact witness. Ford objected and said, for all the same reasons, we didn't do discovery on lost profits, you cannot bring this in now, and they withdrew their objection. So they made zero effort at trial to do what the jury ultimately was instructed it had to find, which was not to put Versada in a better place than it would have been with full performance. So the district court was exactly right that they didn't give the jury the evidence through an expert, through a witness, through a document. Well, the documents were there, the two contracts were there, and one of them laid out costs for support. So, Your Honor, one of them laid out costs for enhanced support, and that enhanced support cost replaced the support that was in the original contract. But if what they want to do now, the argument I heard from Mr. Lampkin is we want to go back to that original contract. That original contract had built-in support for it. And Ms. McMahon, the expert who was excluded, attributed over a million dollars to support costs in that contract. It was excluded because we said we think the number is much higher, we didn't get a chance to do discovery in this, it wasn't disclosed at the correct time. The district court agreed with us. The only other reference to profit margins in the case was from a witness during a deposition who gave a much lower number for the profit margin. But again, this wasn't explored in discovery because of how Versada disclosed what damages it was going to seek in response to, I think that the district court pointed to 10 different times that Ford had asked for how it was going to calculate contract damages. I'd like to save the tiny remainder of my time. I'm going to restore your rebuttal time. Thank you, Your Honor. So, beginning with contract, the Supreme Court was clear, and it was Coleman, that this is, when you're looking at sufficiency of the evidence for Jamal, it's not a fine, parsed effort. Sure, but I think our struggle is, you walked us through a very reasonable way to get there. And if you had said that, even as attorney argument to the jury, I know you weren't there, bad for Versada, but you walked us through that makes sense. But what, in the record, can you support, or can you point to, that shows not just the documents that are there, that you now have put together, but that the jury was told, this is a way you could do it? Are they right? It's one stray sentence in the closing? It is, in the closing, the closing says, flat out, that if you take out or strip out support and maintenance services, pardon? Page number? Oh, I'm sorry. 57,008. I'm sorry, say it again. 57,008. And this is page 126, starting on line 21. Which volume? This is volume... And it says, if you take out or strip out. Sorry, can you just say it one more time? 57,008. I'm going to give you a little extra time, so breathe. You got me. 57,008. Okay, and it's a page, since it's a mini script, there's four pages per page. So you'd have to go to page 126. Which is your upper left-hand corner. Yeah, this is... I'll read it to him, go ahead. You read it to us. And it's line 21 too, it says, if you take out, basically, what are called support and maintenance payments, the number could come down to 1095 for 2014. So if you strip out, that's not really realistic because it's going to use our software, but they want ours. They're going to want our software and support that they would, that they paid for every year. So he says, hey, if you strip that out, you're down to 10.95. And when we look at juries, juries sit in the room, 12 of them, going through the testimony, their recollection of the testimony, going through the documents they have. And they had Elson, excuse me, they had Ford's own witness say, flat out, that it's 10.95 without the services. They had our witness saying, 10 points. And that one. So Davis says- We're going to make you walk through every piece of evidence. I just want to be quick to know what's about to happen. That's great. So you don't feel like you're rushed. Oh, no, it's fine. So first with Ford's expert, Davis, you go to page 56,805, page 96. So page 96 is in your upper right-hand corner there. And the expert explains that the 10.95 takes out that four million of other types of fees and services and support and maintenance and so forth. I guess it's, yeah, 5,005, and it's 96 to 97. So it goes four lines into 97 right below. Because it takes out that four million of other types of fees and services and support and maintenance and so forth. And then the witness then says, but there's other problems. But those problems all related to the fact that they thought that Ford could develop the software more quickly, or they didn't like the fact that it was how it was allocated among trade secrets. But in terms of what the price was for the naked use of the license, the naked use of the software without support, this is absolutely clear from their own witness that it's 10.95 million dollars. And then our witness agreed saying the base license fee, quote, without any of the support or services or extras. Page 56,576. I'm sorry about that. This is page 6, 5, 7, 6. Correct. And this is page 12, lines 18 to 22. And this is our expert, McBann, saying the 10.59 million is a base license fee without any of the support or services. Where, what line? I don't see it, sorry. 12 to 18, unless I've got me in the wrong page. Page 12, 56, 5, 7, 6. Yeah, down there. Now, which of the four pages on that page? That's going to be page 12. OK. Lines 18 to 22. 18 to 22 is a question, it's not an answer. I'm sorry. That's OK. I'm looking at the wrong thing here. Let me look again. And it doesn't say anything about 10.99. 56, 5, 7, 6. 56, 5, 7, 6. 18 to 22. Let's see. The bottom of 13, at least the number 10.95 appears. Yeah. I'm sorry. All right. So I've just got a typo. If you look at page 12, it's lines 18 to 22. It's the left-hand column on 56, 5, 7, 6. Left-hand side, lines 18. Question, that's fine. You said the base license fee in the exhibit. And that by you mean the base. The base license fee is without any of the support services or services. Or extras. I'll tell you. I'll put it that way. Answer, right. That base license fee that it's referring to is the 10.9 number? Yes, exactly. Where all the support is separate on the following.  That's ample evidence for the jury. The district court in trying to come up with some cost that wasn't done, that's the exact opposite of what you do on Rule 50. You respect the judgment to the jurors. If the court wouldn't indulge me just a tiny bit more of the alternative grounds. Yeah, go ahead. Or if the court.  I'm going to make you switch again back to, I think, the trade secrets and the reasonable royalty rates. We talked about the three theories and only one was allowed and two were not allowed. Your opponent talked about pages 84 and 85 of the appendix of district court's opinion as a basis for why the adjustment enrichment error, if we find it, would be harmless for excluding those. I didn't quite follow it, but I wanted to hear what your response on that was. Right. And so all those types of issues are things that we got a second chance on on the other theories. There is one that is not parallel. Ms. Elson's absolutely right. There's one about the data being outdated. But if. Ms. Ellsworth spoke, I think, pretty specifically about a claim of $134 million What was that about? So this is a distinction between the two reasonable royalty theories that were excluded and the unjust enrichment. I thought that was with reference. $134 was the unjust enrichment. Right. And what was that? That was. The claim of $134 for that? Right. What did the $134 purport to be? That purported to be, and that was, how much Ford saved by using our software in terms of avoiding errors, misspells, corrections, and things like that in building its cars. And so that is the unjust enrichment it had from using our software illicitly or improperly in order to build cars. Which it described as a billion dollar problem. Our software solved it. Did the district court say that that was just unavoidably too speculative? Well, the district court's objection to it was that it was based on old data as opposed to more current data. But that's the type of thing that can be fixed or someone can make a correction based on it. We simply were never given the opportunity to make a correction for that, notwithstanding being given the ability to do a correction with respect to other theories. We didn't get that opportunity because the district court proceeded on the erroneous premise that when you do an unjust enrichment, if there's a licensing history, you are precluded from doing unjust enrichment. You have to go on the licensing history. And likewise, you made the same mistake with- Is it your position that all of these issues that Ms. Ellsworth pointed to are somehow intertwined with the mistake related to unjust enrichment? Because I really felt she separated the issues out pretty effectively and demonstrated that some of the concerns articulated by the judge on page 84 and 85 would not be cured in any way by anything related to your supplementation on unjust enrichment. So those concerns were unrelated to the district court's holding on unjust enrichment. Correct. The district court, however, could have given us the ability to correct those concerns in supplemental form as it did with respect- This just comes down to the same thing on the overarching thing is if we think the district court should look at this again in light of what we think is the legal error and have the district court make the decision over whether to give you an opportunity rather than for us to find it harmless. I think that's right for unjust enrichment. For the reasonable royalty, I think the error is absolutely clear that when you do a reasonable royalty, the sole reason given, and this is pages 94 and 95, the sole reason given for excluding our models two and three was you can't get any of Ford's benefit. But when you have an arms-length negotiation over a license, you consider the benefit to the defendant. That's settled law. If the court has no further questions- I do actually want to introduce a new topic that I know Ms. Ellsworth wanted to talk about and ran out of time, but very briefly on the cross appeal. I'm not interested in the question of whether the filing of a notice of a cross appeal was improper, so don't address that. On the merit, explain to me what the allegedly evidence-less necessary element is and why there is sufficient evidence to meet that element. Something having to do with even though Ford knew all of your secrets, didn't know how you combined them or something? Yeah, I think that is- Ford's theory is that they had to know precisely what the trade secret consisted of, and if they didn't know that the precise combination of workspace, buildability, and grid consisted of the- was the trade secret, then it gets a get-out-of-jail-free card. I understand your argument on this to basically boil down to we told them every single one of the individual things were trade secreted. How could the combination not be? Well, it doesn't- No? I think it may be a little better than that. I think it's a little better than that, which is that Ford was given and knew that it wasn't allowed to copy our software outright. It couldn't steal everything, and what it did was it stole three of the most critical elements, the buildability of the grid and the workspace, and you just can't escape knowing that that was absolutely part of our trade secret, and it's a reason to know standard even under the common law, but here it was given to them under a confidentiality agreement which gave them every reason to think that they can't copy it unless it's in the public domain. There's no argument that any of that was in the public domain. If there are no further questions, thank you so much. Okay. Selzwerth. Please limit yourself, obviously, the cross-appeal. I am happy to limit myself to the cross-appeal. Fair enough. Well, you find happiness in strange places.  Understood. I will resist the urge to correct a few other things. On the conditional cross-appeal, I think our argument is very straightforward. Both of these statutes require knowledge of the trade secret, and when you look at the district court, I think correctly pointed to, the district court acknowledged that he didn't see any way that this combination had ever been disclosed as a combination. When you say this combination, what are you referring to? And in particular, how does that two-word phrase relate to the buildability, the other two things? So let's take each one of those, a combination. So the way this is, this really all came up during discovery as a way to avoid their damages expert getting thrown out. They came up with these combination theories. So buildability, Your Honor, there's a user guide section on buildability. It only mentions one of the features that they say are the buildability trade secret. To find the others, you have to look on pages 250, 254, 395, and 434 of the user guide. And you have to somehow know that if you pluck those features, you combine them with one that's in the buildability section, and then you go to a different document and you pull one more feature from this other document, somehow when you put those six things together, there is a protected trade secret. And the district court thought, right, ruled that there was sufficient evidence to avoid J-Mal on that, right? So, Your Honor, I think the district court with some concern said that if he had been sitting on the jury, he would have found this wasn't met because all they did was point to this mountain of documents. And if I could just make two points on that, I think pointing to the mountain of documents was too vague and too inclusive. And I just want to explain what I mean by that. It was too vague because the constituent elements of these trade secrets were never identified as somehow going together to create a superior product. And if you think about it, if I gave you a list of 1,000 ingredients and buried among that 1,000 ingredients happened to be the 10 ingredients that are in the secret formula for Coca-Cola, but I don't ever tell you that those 10 are the ones that go together. If you combine those 10 and you say, wow, this tastes a lot like Coca-Cola, giving you that 1,000 list, that list of 1,000 ingredients did not give you knowledge of the trade secret for Coca-Cola. What if they said all 1,000 of these are trade secreted? So they didn't do that. That is, I think, a big problem with their case. And it's why I heard Mr. Lankin do it. He wants to talk about benefits that Ford got from using our software. But in trade secret misappropriation, they had three combinations that they said were trade secrets. And those combinations together added up to 5 plus 6 plus 3. That's 8 plus 5, 13 elements out of hundreds or thousands of elements in this software. That's it. It's a teeny tiny fraction of the information. But they told you the software was trade secretive, right? No, Your Honor. The software was confidential. And so that's why I think they had a breach of contract argument that was about confidentiality. The trade secrets were these very specific elements, just those elements and not others. So, for example, there's one section where local codes fall into a trade secret. But on the very same page, there's a discussion of global codes. The global codes aren't a trade secret. Just the local codes are. There is no way that a reasonable person presented with this 2,000 plus pages of material about this software and using the software would know how to pluck these various elements from very disparate places in the description of the software and somehow know that it was a combination trade secret. So, for those reasons, Judge Hughes, you were looking for where there are areas that the law needs to be developed. I think this question of what knowledge means in the context of a combination trade secret is an extremely important area for development of the law. Thank you, Your Honors. I thank both counsels. Thank you for your submission.